UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                            )
KAREN BRANDLI,                              )
                                            )
            Plaintiff,                      )
                                            )
      v.                                    )        Civil Action No. 11-1743 (PLF)
                                            )
MICRUS ENDOVASCULAR                         )
   CORPORATION, et al.,                     )
                                            )
            Defendants.                     )
_____)


OPINION

        Plaintiff Karen Brandli brought this sex discrimination suit against her former

employer, Micrus Endovascular Corporation ("Micrus"), Johnson & Johnson Services, Inc.

("JJSI"), Codman & Shurtleff, Inc. ("Codman"), and James Bertrand.  Brandli was a Micrus

employee under Bertrand's supervision until 2010 when JJSI acquired Micrus and merged it with

Codman, a business JJSI owned.  In the process, Micrus terminated Brandli's employment.

Defendants have collectively moved for summary judgment on the grounds that they had

legitimate, nondiscriminatory reasons for not retaining Brandli and that Brandli failed to produce

evidence that these reasons are a pretext for discrimination on the basis of sex.  The Court heard

oral argument on this motion on June 15, 2016.  Upon careful consideration of the parties'

written and oral arguments, the entire record in this case, and the relevant statutes and case law,

the Court will grant defendants' motion.[1]

_____

        [1]        The papers considered in connection with the pending motions include:  Amended
Complaint ("Am. Compl.") [Dkt. 2]; Defendants' Memorandum of Law in Support of Motion for
Summary Judgment ("Mot.") [Dkt. 29-1]; Defendants' Statement of Material Facts as to Which

## I.  BACKGROUND

Karen Brandli began working for Micrus as an account manager in 2006, selling neurosurgery devices in Washington, D.C., Northern Virginia, Maryland, and West Virginia. Am. Compl. ¶ 25; Defs. SMF ¶¶ 1-3.  Brandli's sales quota for Micrus's fiscal year 2007 was $995,000, a quota she substantially exceeded by selling approximately $2.4 million dollars worth of Micrus products during that period.  Am. Compl. ¶ 32.  As a result, Micrus nominated her for its "Sales Rep of the Year" and "Rookie of the Year" awards.  Id. ¶ 33.  In April 2007, Micrus removed Virginia and West Virginia from Brandli's territory and gave them to a new sales representative, Steve Tripp.  Id. ¶ 36.  In 2007, Micrus released the director of sales who had hired Brandli and replaced him with James Bertrand.  Id. ¶ 37.

Micrus reassigned Brandli in 2008 from the northeast region sales territory to the southeast region sales territory.  Defs. SMF ¶ 4.  At that time, Brandli complained to her regional manager that she believed Bertrand was attempting to force her out of her sales territory.  Am. Compl. ¶ 39.  The regional manager mentioned to Brandli that Bertrand had been "throwing around" the notion of assigning Brandli to the sales training division, an assignment that would have deprived Brandli of the opportunity to earn commissions.  Id. ¶¶ 38-40.  Brandli alleges that

There is No Genuine Issue ("Defs. SMF") [Dkt. 29-2]; Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Opp.") [Dkt. 33]; Defendants' Reply in Support of Defendants' Motion for Summary Judgment ("Reply") [Dkt. 35]; Plaintiff's Surreply [Dkt. 36-1]; Plaintiff's Motion to Notify the Court of Supplemental Authority [Dkt. 39]; Plaintiff's Motion to Notify the Court of Supplemental Authority [Dkt. 40]; Plaintiff's Motion to Notify the Court of Supplemental Authority [Dkt. 41]; Plaintiff's Motion to Notify the Court of Supplemental Authority [Dkt. 42]; Plaintiff's Motion to Notify the Court of Supplemental Authority [Dkt. 43]; Plaintiff's Motion to Notify the Court of Supplemental Authority [Dkt. 46]; Plaintiff's Motion to Notify the Court of Supplemental Authority [Dkt. 47]; Plaintiff's Motion to Notify the Court of Supplemental Authority [Dkt. 48]; and Plaintiff's Motion to Notify the Court of Supplemental Authority [Dkt. 49].

during a conference call in 2008 Bertrand stated that he was going to "get rid of" her, and that another manager advised Bertrand not to "do anything more with women right now, because we may have an issue."  Id. ¶¶ 55-56.  Bertrand denies making both statements, and two managers who were present for the conference call confirmed in deposition testimony that Bertrand did not say that he was going to "get rid of" Brandli.  Defs. SMF ¶ 32.

In 2009, Brandli acquired a new account, Chistiana Hospital, and earned for Micrus the majority of Chistiana Hospital's medical coil device business.  Am. Compl. ¶ 59.  As a result, Micrus awarded her "President's Club" status and ranked her as the number three sales representative in North America.  Id. ¶ 60; see also Opp. Ex. 22 [Dkt. 33-32].  Bertrand's predecessor conducted a field visit with Brandli in 2009 and wrote an "excellent review and praised her sales efforts, product knowledge, and relationship with clients."  Opp. at 4; see also Opp. Ex. 21 [Dkt. 33-31].  Her strong performance continued in 2010 when she reached 96% of her yearly quota by April.  Am. Compl. ¶ 61.  But in 2009 Brandli received a rating of "meets expectation" as opposed to the higher rating of "exceeds expectation," and defendants assert that Brandli's supervisor received customer complaints that Brandli was "abrasive."  Defs. SMF ¶ 13.  Micrus never placed Brandli on a performance improvement plan ("PIP"), a measure that is commonly taken when a sales employee performs below expectations.  Opp. at 4.

In 2010, JJSI publicly announced its intention to acquire Micrus.  Am. Compl. ¶ 64.  JJSI owned Codman, one of Micrus's competitors, and JJSI intended to run Micrus as one of Codman's business units.  Id. ¶ 62; Defs. SMF ¶¶ 5-6.  Codman anticipated that there would be overlap in the post-acquisition sales territories, which meant that Codman planned to terminate some sales representatives from the post-acquisition entity.  Defs. SMF ¶ 7.  On September 29, 2010, Codman informed Brandli that defendants would terminate her employment

3

effective October 31, 2010.  Am. Compl. ¶ 71.  Defendants thereafter gave sales responsibilities

in Brandli's territory to two male Codman sales representatives, Daniel Garrison and Christopher

Kearney.  Id. ¶ 96; Defs. SMF ¶ 19.

       Brandli filed this sex discrimination suit against the defendants in 2011, alleging

that she was terminated on the basis of her sex.  Am. Compl. ¶ 2.  She initially asserted five

claims:  (1) against all defendants, a claim of discrimination on the basis of sex in violation of

the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1402.11(a)(1) (2012

Repl.); (2) against Bertrand, a claim of aiding and abetting discrimination on the basis of sex in

violation of the DCHRA; (3) against JJSI and Codman, a failure-to-hire claim that is also

premised on discriminating on the basis of sex in violation of the DCHRA; (4) against all

defendants except Bertrand, a common law negligent hiring claim for the defendants' hiring of

Bertrand; and (5) against Bertrand, a common law tortious interference with business

expectations claim.  Am. Compl. ¶¶ 100-70.  In her opposition to the motion for summary

judgment, Brandli stated that she was withdrawing Counts 4 and 5, the common law claims.  See

Opp. at 1 n.1.  In support of her sex discrimination claims, Brandli alleges that defendants:

forced her out of her sales territory; forced out other female employees and replaced them with

males; required her to prepare reports justifying her sales numbers; placed other female sales

representatives on PIPs; failed to select her for a position on the Field Advisory Board; and

praised only male employees.  Am. Compl. ¶ 105.

       Defendants moved for summary judgment on each count of the amended

complaint.  With respect to the sex discrimination claims, they argue that:  (1) they had a

legitimate, nondiscriminatory reason for terminating Brandli and that Brandli has not shown that

the reason is pretextual; (2) the Court cannot infer discrimination because Garrison and Kearney

had stronger credentials than Brandli; (3) Brandli's failure-to-hire DCHRA claim is not based on

a tangible adverse employment action and is untimely; and (4) if the underlying DCHRA claim

fails, the aiding-and-abetting claim against Bertrand must also fail.  Mot. at 12-26.

## II.  DISCUSSION

Summary judgment is appropriate only if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Baumann v. District of

Columbia, 795 F.3d 209, 215 (D.C. Cir. 2015); FED. R. CIV. P. 56(a), (c).  In making that

determination, the court must view the evidence in the light most favorable to the nonmoving

party and draw all reasonable inferences in its favor.  Baumann v. District of Columbia, 795 F.3d

at 215; see Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (per curiam); Anderson v. Liberty

Lobby, Inc., 477 U.S. at 255; Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011).  A disputed

fact is "material" if it "might affect the outcome of the suit under the governing law."  Talavera

v. Shah, 638 F.3d at 308 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  A dispute

over a material fact is "genuine" if it could lead a reasonable jury to return a verdict in favor of

the nonmoving party.  See Scott v. Harris, 550 U.S. 372, 380 (2007); Grimes v. District of

Columbia, 794 F.3d 83, 94-95 (D.C. Cir. 2015); Paige v. DEA, 665 F.3d 1355, 1358 (D.C. Cir.

2012).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge at summary judgment.  Thus,

[the court] do[es] not determine the truth of the matter, but instead decide[s] only whether there

is a genuine issue for trial."  Barnett v. PA Consulting Group, Inc., 715 F.3d 354, 358 (D.C. Cir.

2013) (quoting Pardo-Kronemann v. Donovan, 601 F.3d 599, 604 (D.C. Cir. 2010)); see also

Tolan v. Cotton, 134 S. Ct. at 1866; Baumann v. Dist. of Columbia, 795 F.3d at 215; Allen v.

Johnson, 795 F.3d 34, 38 (D.C. Cir. 2015).

    The Court will first review the legal framework for analyzing Brandli's claim,

placing special emphasis on Brandli's chosen theory of defendants' liability under the DCHRA,

and then discuss whether Brandli's two main pieces of evidence — statements of other female

employees and Codman's employee selection model — create a genuine issue of material fact

entitling her to a jury trial on her claims.

### A.  *McDonnell Douglas and Brandli's* *Cat's-Paw Theory of Liability*

    Title VII prohibits discrimination by an employer against "any individual" based

on that individual's "race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a), and

the DCHRA contains a similar provision.  See D.C. Code § 2-1402.11(a).  Brandli alleges that

defendants discriminated against her on the basis of her sex.  "[F]ederal case law addressing

questions arising in Title VII cases is applicable to the resolution of analogous issues raised

regarding DCHRA claims."  Ali v. District of Columbia, 697 F. Supp. 2d 88, 92 n.6 (D.D.C.

2010) (citing Howard Univ. v. Green, 652 A.2d 41, 45 n.3 (D.C. 1994)); see also Whitbeck v.

Vital Signs, Inc., 116 F.3d 588, 591 (D.C. Cir. 1997) ("District of Columbia courts interpreting

the DCHRA 'have generally looked [for guidance] to cases from the federal courts' arising under

federal civil rights statutes." (quoting Benefits Communication Corp. v. Klieforth, 642 A.2d

1299, 1301-02 (D.C. 1994))).  "A plaintiff may prove her Title VII discrimination or retaliation

claim with direct evidence, for example through a statement that itself shows racial bias in the

employment decision.  Alternatively, a plaintiff may base her claim on circumstantial evidence

under the familiar McDonnell Douglas burden-shifting framework."  Nurriddin v. Bolden, 818

F.3d 751, 758 (D.C. Cir. 2016).  Here, because Brandli offers no direct evidence, the Court will

analyze Brandli's DCHRA claims under McDonnell Douglas Corp. v. Green, 411 U.S. 792

(1973).

   The McDonnell Douglas burden-shifting framework contains three steps.  First,

the burden is on the employee to make a prima facie case of retaliation or discrimination.  411

U.S. at 801-02.  Second, if the employee does so, the burden shifts to the employer to offer a

legitimate, nondiscriminatory reason for the challenged action.  Morris v. McCarthy, 825 F.3d

658, 668 (D.C. Cir. 2016).  Third, if the employer does so, the McDonnell Douglas burden-

shifting analysis "falls away," id., and "the district court must resolve one central question:  Has

the employee produced sufficient evidence for a reasonable jury to find that the employer's

asserted non-discriminatory reason was not the actual reason and that the employer intentionally

discriminated against the employee on the basis of [sex]?"  Brady v. Office of Sergeant at Arms,

520 F.3d 490, 494 (D.C. Cir. 2008); see also Gaujacq v. EDF, Inc., 601 F.3d 565, 576 (D.C. Cir.

2010).  "The employee can survive summary judgment by providing enough evidence for a

reasonable jury to find that the employer's proffered explanation was a pretext for retaliation or

discrimination."  Morris v. McCarthy, 825 F.3d at 668; see also Nurriddin v. Bolden, 818 F.3d at

758-59.

   Defendants do not dispute that Brandli is a member of a protected class, that she

was qualified for her job, or that her termination was an adverse employment action.  They

maintain, however, that they had a legitimate, nondiscriminatory reason for terminating her:  JJSI

could not afford to retain all of Micrus's sales representatives when it merged Micrus with

Codman, and the two persons selected had higher assessment scores than Brandli.  Defs. SMF

¶¶ 7-8.  It is established that "terminat[ing an employee] as part of the company's larger

reorganization . . . constitute[s a] legitimate, non-discriminatory reason[.]" <u>Edmonds v. Engility Corp.</u>, 82 F. Supp. 3d 337, 341-42 (D.D.C. 2015), <u>aff'd</u> (Jan. 21, 2016); <u>see</u> <u>also</u> <u>Gross v. Logistics Support, Inc.</u>, 952 F. Supp. 2d 119, 124 (D.D.C. 2013) ("implementing cost-cutting measures" is a legitimate, nondiscriminatory reason for an employer to terminate an employee). "[W]here an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not — *and should not* — decide whether the plaintiff actually made out a prima facie case under <u>McDonnell Douglas</u>." <u>Brady v. Office of Sergeant at Arms</u>, 520 F.3d at 494 (emphasis in original).  The question in this case therefore is whether, viewing the evidence in the light most favorable to Brandli, her evidence would allow a reasonable jury to conclude that JJSI's proffered reason for terminating her was not the actual reason for her termination and that defendants intentionally discriminated against her on the basis of sex.

Brandli relies entirely on the so-called "cat's-paw" theory of liability for her DCHRA claims.  Opp. at 15, 17-21, 28.[2]  "Under that theory, the discriminatory animus of a subordinate who recommends an adverse employment decision is imputed to the selecting officer who relies on the subordinate's recommendation." <u>McNally v. Norton</u>, 498 F. Supp. 2d 167, 184 n.16 (D.D.C. 2007).[3]  As the D.C. Circuit recently explained:  "Under a cat's-paw theory of

---

[2]    In her opposition to defendants' motion for summary judgment, Brandli withdrew her common law claims, Opp. at 1 n.1, and abandoned all theories of DCHRA liability besides the "cat's-paw" theory.  <u>Id.</u> at 15-17.

[3]    "The term 'cat's paw' was introduced to the legal lexicon by Judge Posner in <u>Shager v. Upjohn Co.</u>, 913 F.2d 398, 405 (7th Cir. 1990).  The term comes from one of [Ae]sop's fables in which a clever monkey entices a cat into retrieving roasting chestnuts from a fire, only to steal the nuts and leave the cat with nothing but a burnt paw.  The term is shorthand for one who uses another as a means to accomplish an unsavory task." <u>Waggoner v. City of Battle Creek</u>, No. 12-0827, 2014 WL 1328167, at *3 (W.D. Mich. Mar. 28, 2014).

discrimination, an employer may be held liable for discriminatory acts by a direct supervisor —

even where that supervisor is not the final decision maker — if '[1] [the] supervisor performs an

act motivated by [discriminatory] animus [2] that is *intended* by the supervisor to cause an

adverse employment action, and . . . [3] that act is a proximate cause of the ultimate employment

action.'" Morris v. McCarthy, 825 F.3d at 668 (quoting Staub v. Proctor Hosp., 562 U.S. 411,

422 (2011) (internal citation omitted)) (emphasis in original); see also Griffin v. Washington

Convention Ctr., 142 F.3d 1308, 1311 (D.C. Cir. 1998); Furline v. Morrison, 953 A.2d 344, 355

(D.C. 2008).

   Here, Brandli's theory is that Bertrand was a supervisor who — although he did

not personally make the decision to terminate her — performed acts motivated by discriminatory

animus that he intended to cause and which actually did cause her termination. Opp. at 21.[4]

Brandli has no direct evidence that discriminatory animus motivated Bertrand's actions in this

case and instead attempts to prove Bertrand's animus with two kinds of circumstantial evidence:

(1) the statements of other female Micrus employees; and (2) reasons why Codman's employee

selection model and the manner in which it was implemented discriminated against Brandli on

the basis of her sex.[5]

---

   [4]   Brandli argues that because she now relies exclusively on the alternative theory of
"cat's paw" or "subordinate bias" liability, evidence of pretext is not required. Opp. at 15. In
her view, the "pretext" aspect of McDonnell Douglas now is irrelevant. Id. at 17. A careful
reading of the D.C. Circuit's most recent decision on "cat's-paw" liability, Morris v. McCarthy,
825 F.3d 658 (D.C. Cir. 2016), demonstrates that she is clearly wrong. See id. at 668-69. That
case instructs that, when confronted with a cat's-paw theory of liability, the Court should reframe
the search for pretext under McDonnell Douglas to ask whether — based on all of the evidence
— a reasonable jury could find that the plaintiff has met the three prongs of cat's-law liability
that the Supreme Court articulated in Staub v. Proctor Hospital. Id. Because the Court finds that
Brandli fails to meet the first prong (discriminatory animus), it does not consider the second or
third. See infra at n.6.

   [5]   The Sixth and Seventh circuits have explicitly approved of circumstantial
evidence as proof of animus under a cat's-paw theory of Title VII liability. See Smith v. Bray,

*B.  Statements of Other Female Employees as Evidence of Animus*

Brandli asserts that, after Bertrand's arrival in 2007, he demonstrated a pattern and practice of laying off or otherwise forcing female employees to quit.  Am. Compl. ¶ 98. Brandli alleges that five women had their employment terminated or quit because of Bertrand: (1) Susan Rizzuti, a sales representative in New York and Connecticut; (2) Beata Bosley, a sales representative in Atlanta; (3) Julie Bragg, a sales representative in Chicago; (4) Gina Hohl, a sales representative in Kansas City; and (5) Kathryn Meintsma, the director of education.  Id. ¶¶ 45-53.  Brandli concedes that she has no personal knowledge of discrimination against these female employees or Bertrand's role in any adverse actions taken against them; she is relying solely on what she heard or was told.  Mot. at 5.

The defendants directly dispute Brandli's characterization with respect to Rizzuti, Bosley, and Hohl.  They say:  (1) Rizzuti complained only that Bertrand engaged in nepotism, not that he engaged in sexism or sexual harassment, Defs. SMF ¶ 23; (2) Bosley merely said that she "heard" that Bertrand had "issues with her," but she did not know whether they related to her sex, id. ¶ 21; and (3) Hohl testified that her manager (not Bertrand) was responsible for mistreating her.  Id. ¶ 22.  The defendants also argue that Brandli pled no facts showing that Bragg or Meintsma were "forced out" of their sales territories.  Id. ¶¶ 28, 32.  The deposition testimony of Bosley, Hohl, and Rizzuti does not support Brandli's assertions.  Their testimony

681 F.3d 888, 901 (7th Cir. 2012) ("In the absence of an admission, a retaliation plaintiff may also satisfy the causation or motive element by presenting a 'convincing mosaic' of 'circumstantial evidence' that would support the inference that a retaliatory animus was at work."); Johnson v. Metro. Gov't of Nashville & Davidson Cty., Tenn., 502 F. App'x 523, 535 n.4 (6th Cir. 2012) ("The 'rubber-stamp' or 'cat's paw' theory of liability . . . is more appropriately dealt with in circumstantial evidence review.").

consists largely of hearsay, conclusions, speculation, and personal beliefs rather than personal

knowledge, which is not circumstantial evidence of Bertrand's discriminatory animus.

Former sales representative Beata Bosley testified that:  (1) "she informed

Micrus's HR department of her belief that [Bertrand was hostile to her] because of gender";

(2) there was a "change in culture that occurred within the sales division after Mr. Bertrand was

brought in as director"; (3) Micrus put her on a PIP that "required her to achieve a quota within a

month's time 'which was impossible to do'"; and (4) Micrus subsequently fired her and replaced

her with a man.  Opp. at 6-7.  The Court's review of Bosley's deposition testimony, however,

yields no evidence that Bertrand personally engaged in any discriminatory conduct or

demonstrated discriminatory animus.  First, Bosley merely stated her "belief" that Bertrand

discriminated against her on the basis of her sex.  This "belief" and Bosley's statement about a

"change in culture" under Bertrand's leadership constitute "conclusory speculation devoid of any

factual foundation or connection to the performance review of plaintiff."  Robinson v. Duncan,

775 F. Supp. 2d 143, 154 (D.D.C. 2011).  Testimony that "contain[s] nothing more than

unsubstantiated rumors, conclusory allegations, and subjective beliefs[,] [is] wholly insufficient

to establish an inference of discrimination."  Glass v. Lahood, 786 F. Supp. 2d 189, 218 (D.D.C.

2011).  Second, the fact that Micrus put Bosley on a PIP says nothing about Bertrand's

discriminatory animus.  Indeed, Robert Colloton, Micrus's vice president for sales and

marketing, testified in his deposition that several people collectively made the decision to place

Bosley on a PIP because her sales performance was "poor" and "[b]elow sales quota."  Opp. Ex.

1 at 52:6-52:12.  Those people were Colloton, Bertrand, Eve Lai, former director of human

resources, and Nick Lenamon, vice president of sales and marketing (as well as Bosley's direct

supervisor).  Id.

Brandli next cites the deposition testimony of former sales representative Gina

Hohl.  Brandli states that Hohl:  (1) complained to Lai in human resources about Bertrand;

(2) complained about "the culture under Mr. Bertrand's leadership, including sexist comments

made by male sales managers under his supervision"; (3) testified that, when Bertrand became

director of the sales division, the sales quotas for female sales representatives "sometimes"

increased "by 20-30 percent a quarter," while the sales quotas for male sales representatives "on

[Bertrand's] team" increased "by only 5-7 percent"; (4) testified that, during Bertrand's tenure,

female sales representatives had more onerous travel requirements than male sales

representatives; and (5) testified that Bertrand socialized only with male sales representatives

during sales meetings.  Opp. at 7-8.  Brandli also states that Micrus fired Hohl after placing her

on a PIP and then replaced her with a man.  Opp. Ex. 7 at 20:15-21:19; see also Opp. at 7-8.

The Court finds that none of Hohl's testimony creates a reasonable inference of

Bertrand's discriminatory animus.  First, according to Colloton's testimony — which neither

Brandli nor Hohl contradicts — four supervisors, not Bertrand individually, placed Hohl on a

PIP.  Opp. Ex. 1 at 54:9-54:17, 55:19-55:22.  As for Hohl's assertion that there were objectively

different sales quotas for men and women, it would be significant if it were substantiated with

data — data that Brandli supplies in other contexts — but it is not.  Brandli next cites Hohl's

allegations of sexist comments by men whom Bertrand supervised, an alleged change in the

culture, and sex-based favoritism — including allegations of more onerous travel requirements

for women and Bertrand's penchant for socializing with male employees.  None of these

assertions supports the claim that Bertrand himself showed discriminatory animus toward Hohl,

let alone toward Brandli.  Furthermore, Lai testified in her deposition that the human resources

12

department investigated Bosley's claims regarding Bertrand's alleged sexism and "didn't find any evidence that [Micrus] w[as] discriminating against women."  Opp. Ex. 5 at 39:25-40:3.

Brandli states that former sales representative Susan Rizzuti testified at her deposition that:  (1) Micrus took away 18 of her 23 accounts and gave them to a man who had "no relevant experience"; (2) eight female sales representatives  "had either been let go or left on their own, for their own — for certain reasons of their own"; (3) she received a sexist comment from a male manager whom Bertrand supervised; (4) Bertrand encouraged a "drinking game at a sales event that 'the guys enjoyed,'" but the women did not; and (5) male sales representatives would refer to Bertrand by the nickname "Jimbo."  Opp. Ex. 8 at 49:13-49:21; see also Opp. at 8-9.  Rizzuti's conclusion that these five circumstances demonstrate that Bertrand harbored animus against women is pure speculation.  First, neither Brandli nor Rizzuti explains why any of the eight female representatives left "for certain reasons of their own."  Second, Brandli offers no objective evidence to substantiate Rizzuti's contention that the man who took 18 of her 23 accounts had no relevant experience.  Finally — for the same reasons described above with respect to Bosley and Hohl's claims concerning sexist comments by men other than Bertrand, alleged changes in the culture within the sales division, and Bertrand's penchant for socializing with men — the Court again finds that none of Rizzuti's testimony establishes any basis on which a reasonable jury could conclude that Bertrand himself acted with discriminatory animus.  As defendants correctly point out, Bertrand's conduct smacks more of cronyism than discriminatory animus.  Mem. at 18.

In addition, Micrus conducted investigations into the complaints of these female employees about Bertrand's conduct.  As Brandli explains in her opposition, there were:

> complaints from several female co-workers of Plaintiff (fellow sales reps) that Mr. Bertrand was running the sales division as a "boys club" and as a "good old

boys network[";] that the management team he had assembled were all men, including men with no experience in the sale of medical devices but who had worked with Mr. Bertrand in the past; and that he was "discriminating against females or targeting females" in his division. . . . The exodus of women out of the sales division managed by Mr. Bertrand did not escape the attention of the CEO and COO of Micrus. . . . [T]he gender-based complaints about Mr. Bertrand were of such concern to the senior management of Micrus that it prompted discussions at that level (along with the Director of Human Resources) "to make sure that we're not age or gender biased" and "we were not having gender discrimination[.]" . . . The complaints about Mr. Bertrand also prompted the Vice President of Sales and Marketing (Mr. Colloton) to advise Mr. Bertrand during regular calls with him of "the need to make sure that age and gender issues were being taken care of."  The complaints of Mr. Bertrand's bias against female sales reps were of such concern to the senior management of Micrus that an investigation into the matter was launched by the Vice President of Human Resources, with the assistance of the general counsel's office at Micrus, in which regional managers, all of whom were men, and several put in place by Mr. Bertrand, were asked questions of gender-related matters.

Opp. at 11-13.  The Court finds, however, that these investigations do not support an inference of Bertrand's discriminatory animus.  "[B]ecause we know little 'about the nature, merit, or outcome of [these] complaints,' past complaints have limited probative value and do not create a genuine issue of material fact about whether [Brandli] was passed over because of her sex." Gray v. Foxx, 637 F. App'x 603, 607 (D.C. Cir. 2015) (quoting Holcomb v. Powell, 433 F.3d 889, 900 (D.C. Cir. 2006)); see also Hairston v. Vance-Cooks, 773 F.3d 266, 274 (D.C. Cir. 2014) (finding no genuine issue of material fact where employee "relie[d] on discrimination complaints filed in the past to establish institutional discrimination").  The Court here knows nothing more than what is contained in Lai's deposition testimony, namely, that the human resources department conducted investigations and "didn't find any evidence that [defendants were] discriminating against women."  Opp. Ex. 5 at 39:25-40:3.

The statements of other female employees about Bertrand and Micrus's investigations of those female employees' complaints therefore do not provide evidence from which a reasonable jury could conclude that Bertrand acted with discriminatory animus.

14

### C.  Codman's Employee Selection Model as Evidence of Animus

Finally, Brandli alleges that the competency model that Micrus and Codman used to select which employees to retain and which to terminate was itself imbued with discriminatory animus.  According to the defendants, Codman used the following four-step selection process to decide which sales representatives to retain:

> First, a third-party vendor helped draw the lines for the integrated sales territory structure based on both companies' existing and prospective business opportunities across the country.   Second, Codman determined the number of sales representatives that the new territory structure would support.  Third, Codman determined that sales representatives would not be moved to different geographies in order to ensure continuity.  Fourth, Codman and Micrus separately assessed each sales representative's talent using Codman's existing competency model in order to determine which representative's skill sets were more developed in territories where there were more sales representatives than needed.  The representatives with the highest assessment scores in territories where there were fewer positions than candidates were retained.

Defs. SMF ¶ 8.  At the fourth step, both Micrus and Codman used a competency model developed for Codman by a third-party consultant — the so-called Codman competency model.  Id. ¶ 11.  That model measured the skill levels of sales representatives on five criteria.  Id.  The maximum possible score on each criterion was 5, so the maximum total score any sales representative could receive was 25.

Defendants state that Bertrand was responsible for scoring each Micrus representative based on his opinions and views of each sales representative, as well as discussions with the manager of each representative, other Micrus executives, and customer service personnel, while John Murray, Codman's director of U.S. sales, was responsible for scoring each Codman sales representatives.  Defs. SMF ¶¶ 10-12.  According to defendants, Bertrand and Murray acted independently; they did not know of or discuss each other's scores before submitting them to Jane Clough, Codman's director of human resources at the time of the

acquisition.  Id. ¶¶ 14-17.  Clough stated during her deposition that "Mr. Bertrand and Mr. Murray were to assess all of their sales reps . . . independent of one another."  Mot. Ex. 3 at 45:22-46:19; see also id. at 135:12-135:22.  Murray stated during his deposition that his role was "to assess the performance of the Codman Neurovascular sales team and to determine . . . a stack ranking of salespeople," Mot. Ex. 4 at 42:2-42:6, and that he and Bertrand "didn't have a specific conversation around that Micrus sales organization" because they "were given clear direction not to do that."  Id. at 68:15-68:17; see also id. at 108:12-108:15 ("I was provided a template to utilize in the process and given direction to be objective and to do it separate from the Micrus assessment.").  Bertrand's deposition testimony confirms this process of independently assessing performance at Codman and Micrus.  Mot. Ex. 2 at 219:3-219:10.  The record shows that Bertrand gave Brandli an overall score of 16 out of a possible 25, while Murray gave two male Codman sales representatives named Daniel Garrison and Christopher Kearney overall scores of 17 and 19.  Defs. SMF ¶¶ 14-15, 19.

   Brandli, however, alleges that Bertrand and Murray in fact did discuss their scores before providing them to Jane Clough.  Opp. at 2-3.  Brandli relies on the deposition testimony of Colloton:

> Q. After you received the [final] list [of Micrus sales representatives], did you have any discussions with Mr. Bertrand about who's on the list?
> A. Yes.
> Q. What discussions did you have with him on that?
> A. We decided who was going to go and let those people go . . .
> Q. It's correct to say that you didn't have any substantive input on who was on the list and who was not on the list?
> A. That's correct.
> Q. Your understanding at the time was that that was solely Mr. Bertrand's decision?
> A. No.
> Q. All right. Well, who else had input on the Micrus list?

A.      I'm sorry.  It was a joint — my understanding is it was a joint
discussion between Mr. Murray and Mr. Bertrand about that final
list.  So Mr. Murray would have had some input into the Micrus
personnel.  Very small market.  People knew people.  So I believe
there was feedback.  My understanding is there was feedback from
both sides of the deal on both sides of the sales reps.

Opp. Ex. 1 at 87:11-88:20.

The Court reads Colloton's testimony that "it was a joint discussion between Mr.

Murray and Mr. Bertrand about that final list" to mean — as Bertrand and Murray both testified

— simply that they engaged in a discussion in the course of combining their rankings into a final

list once each independently scored and ranked the employees within his own company.  There is

no evidence of any ex ante discussions about what score the other should give to each of his

employees.  In any event, Colloton's explanation of the competency model and the

communications, if any, between Bertrand and Murray, is not entitled to much weight because he

was not speaking from personal knowledge.  The record is undisputed that Colloton was

deliberately taken out of the process, Opp. Ex. 1 at 84:1-84:9, and learned about it second-hand

from Dick Snyder, Micrus's vice president for human resources.  Id. at 88:21-88:23.  Moreover,

even if Bertrand had been able to influence Murray's rankings, that fact would not provide the

critical missing piece from Brandli's DCHRA claim:  an inference of Bertrand's discriminatory

animus.

As noted, Bertrand gave Brandli an overall score of 16.  Defs. SMF ¶ 16.

Bertrand rated 27 representatives in total, of which 15 males and four females were rated higher

than Brandli, and four males and four females were rated lower than or equal to Brandli.  Id.;

Opp. at 5.  After Bertrand and Murray sent their assessment scores and rankings to Clough, they

met with her in person to review the assessments and determine who would be retained.  Defs.

SMF ¶¶ 17-18.  Defendants "selected the reps with the highest assessment scores for retention."

Id. ¶ 18.  In Brandli's territory, there were three candidates for two possible positions — Brandli, Kearney, and Garrison.  Defendants selected Kearney and Garrison — both of whom had received higher scores than Brandli — for continued employment while choosing to terminate Brandli.  Id. ¶ 19.  According to the undisputed representations of the defendants, every employee who was rated lowest in a territory where there were more representatives than available positions had his or her employment terminated, regardless of their gender.  Id. ¶ 20; see Opp. at 6.  The Court therefore finds no basis upon which a reasonable jury could conclude that Bertrand acted with discriminatory animus.

Brandli has one more piece to her argument:  Even if Bertrand and Murray did not discuss their scores before giving them to Clough, Codman solicited, relied on, and accepted — without independent verification — Bertrand's assessment of Brandli's job performance.  Brandli argues that Bertrand's assessment was imbued with discrimination on the basis of sex.  Opp. at 5.  But this contention begs the ultimate question of whether Brandli has adduced any evidence from which a reasonable jury could reach the conclusion that Bertrand acted with discriminatory animus.  Brandli has failed to support that predicate for this piece to her argument, and therefore it must also fail.

III.  CONCLUSION

Based on all of the evidence that Brandli has presented, and viewing the evidence in the light most favorable to her, the Court concludes that there is no genuine issue of material fact concerning Bertrand's discriminatory animus under the cat's-paw theory of liability, the only theory on which Brandli is proceeding.[6]  Defendants have articulated legitimate,

---

[6]    The Court does not address whether Bertrand intended to cause or actually did cause Brandli's termination.  See Burley v. Nat'l Passenger Rail Corp., 801 F.3d 290, 297 (D.C.

nondiscriminatory reasons for their decision to terminate Brandli — namely, that after Codman's acquisition of Micrus, some sales representatives in each territory had to be terminated, and the application of the Codman competency model resulted in Brandli's ranking lowest among three employees, only two of whom could be retained following the merger.  Brandli has not shown that defendants' competency model is mere pretext by "produc[ing] evidence sufficient for a reasonable jury to find that the employer's stated reason was not the actual reason and that the employer intentionally discriminated" against her because of her sex.  Brady v. Office of Sergeant at Arms, 520 F.3d at 495.  Nor do the statements of the other female employees on which Brandli relies demonstrate animus on the part of Bertrand.  The Court therefore concludes that no reasonable jury could conclude that Bertrand acted with discriminatory animus with respect to Brandli's termination.

For these reasons, the Court will grant summary judgment for defendants on all remaining counts.  An Order consistent with this Opinion shall issue this same day.

SO ORDERED.

_/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  September 21, 2016

---

Cir. 2015) (refraining to proceed to steps two and three of the test for cat's-paw liability because plaintiff did not raise a reasonable inference of racial discrimination).